# AFFIDAVIT

I, Derek Garth, being duly sworn, depose and state that:

## INTRODUCTION AND AGENT BACKGROUND

1. I am presently employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I graduated from the Federal Law Enforcement Training Center in addition to the Special Agent Basic Training at the ATF National Academy in November 2023. Prior to being hired by the ATF in April 2023, I was employed by the Kansas City, Missouri Police Department for over six years with experience in both patrol and a specialized proactive unit (Impact Unit). While in the Impact Unit, I conducted car stops, warrant arrests, and other enforcement activities requested by investigative units of surrounding state, local, and federal agencies. In this capacity, I completed a multitude of street level investigations involving felonies and misdemeanors, many of which involved the use of firearms.

2. This affidavit contains information necessary to support probable cause for this application. It is not intended to include every fact or matter observed by me or known by law enforcement. The information provided is based on my personal knowledge and observation during the course of this investigation, information conveyed to me by other law enforcement officials, and my review of records, documents, and other physical evidence obtained during the investigation.

## QUALIFYING STATEMENTS

3. Based on my training, professional education, and experience, I have learned the following about the distribution of firearms and the methods of operation of individuals involved in illegal firearms trafficking:

    a. Federal Firearm Licensees (FFLs), which are licensed to deal firearms and

are regulated by the ATF, are required to have prospective non-licensed and non-permitted firearm purchasers complete ATF Form 4473 (Firearms Transaction Record) prior to the purchase of a firearm. The FFL also requires photo identification from each purchaser at the time of transfer. The Firearms Transaction Record requires each purchaser to answer basic biographical questions about him/herself as well as questions about prior criminal convictions and/or conduct that may prohibit their possession of firearms. Once that information is communicated to the FFL, the FFL then contacts the Federal Bureau of Investigation (FBI) National Instant Check System (NICS) to see if the prospective buyer is prohibited from purchasing or possessing firearms. If the prospective buyer is not prohibited, the firearm is immediately transferred. If there is a question as to their prohibited status, the transfer can be delayed for up to three business days. If the person is clearly prohibited, the firearm transaction is immediately denied.

   b. The Firearm Transaction Record additionally requires each purchaser to verify that he/she is the actual transferee/buyer of the firearm(s) listed on the form. The Firearms Transaction Record further provides a warning to the purchaser that they are not the actual transferee/buyer of the firearm if they are acquiring the firearm on behalf of another person, and that if they are not the actual transferee/buyer, the FFL cannot transfer the firearm to the purchaser. As further outlined below, this question is designed to prevent the "straw" purchasing of firearms for individuals who are prohibited, as well as to prevent individuals from circumventing firearms purchasing laws, including the accurate tracing of firearms.

   c. Individuals who are prohibited from possessing firearms or who unsuccessfully attempt to acquire firearms through FFLs very often pursue illegitimate channels to acquire firearms. I know that these individuals will sometimes utilize "straw" purchasers to obtain firearms. These "straw" purchasers assist prohibited persons with circumventing existing regulations that prevent them from acquiring firearms legitimately. Often times, the straw purchasers may themselves be prohibited from possessing or acquiring firearms but are able to circumvent existing laws and/or regulations through a variety of means, to include having a weapons permit, utilizing gun shows, or making misrepresentations on ATF Form 4473 (Firearms Transaction Record) during the acquisition of firearms.

   d. Individuals involved in illegal firearms trafficking often store their trafficking documentation in their residence. Firearms traffickers in many instances will "front" (that is, sell on consignment) firearms to their clients and keep records of items paid and owed. Additionally, firearms traffickers often maintain telephone numbers and addresses of clients and suppliers and keep those records readily available in order to efficiently conduct their trafficking or illegal distribution business. These records are often kept by those individuals for long periods of time, to include multiple years. Further, firearms traffickers may also store receipts related to the purchase of firearms in their home, including the purchase receipt, or the packaging for the purchased firearm.

   e. Firearms traffickers sometimes conceal at their residences large sums of money, which are either the proceeds from sales or monies to be used to purchase firearms. In this connection, traffickers can make use of wire transfers, cashier's checks, and money orders to receive payment. Evidence of such financial transactions and records relating to

income and expenditures of money in connection with firearms trafficking is also typically maintained in residences.  Again, these types of records are often kept by these individuals for long periods of time, including years.

   f. Firearms traffickers often use personal computing devices and cellular telephones to maintain records regarding their acquisition and distribution of firearms, to photograph firearms to be sold or traded, to research firearms, and to communicate with customers and suppliers. Electronic devices can store information for long periods of time, and data can in some cases be recovered from a device even if it has been deleted by the user.  Based on my training, professional education, and experience, I know that when an individual acquires a new cellular telephone, information from a prior cellular telephone, including photographs, emails, text messages, and voicemails, can be and often is transferred to the individual's new cellular telephone.  I also know that even when individuals acquire a new cellular telephone, the old device is typically still kept by the individual for a long period of time.

   g. Firearms, when functioned, leave a unique "signature" or "impression" on expelled shell casings or projectiles (bullets). These impressions are now routinely being recorded, documented, and entered into a digitized database that can be used to help investigators track a specific firearm's route of travel, activity the firearm was involved in, and provide investigative leads that may assist in solving crimes. The database is referred to as NIBIN (National Integrated Ballistic Information Network).

   h. Firearms that are recovered by law enforcement during the course of their official duties are routinely traced through the ATF as part of their investigations. The tracing data provides investigators with information about who purchased the firearm, where it was purchased, and whether multiple firearms were purchased at the same time. The period from the time a firearm is purchased to when it is recovered and traced by law enforcement is referred to as "time to crime." These time periods are important, as they can provide investigators with important indicators that the firearms are being sold or traded to prohibited persons.

## CASE BACKGROUND

4. While investigating an alleged firearms trafficking group, investigators located Rodney ELLISON and Ernest HALL as possible contacts/contributors to the alleged firearms trafficking group. An ATF Confidential Informant (hereinafter CI[1]) informed investigators that s/he was familiar with ELLISON and confirmed that ELLISON does traffic in firearms.

---

[1] CI#1 has previously been arrested six times, with the most recent arrest in 2008. CI#1 is cooperating with law enforcement for monetary compensation. CI#1 has been cooperating with law enforcement for approximately 17 years. The information CI#1 has provided, in this investigation and in previous investigations, has proven to be accurate and truthful. The information provided has been corroborated by multiple investigative techniques. CI#1's information concerning HALL & ELLISON has been corroborated by information obtained from public databases, physical surveillance, controlled drug purchases, search warrants, and other cooperating informants. I therefore believe CI#1 is credible and the information provided by CI#1 is reliable.

## PURCHASE OF FIREARM #1

5.      Between June 15, 2024, and June 18, 2024, the CI had in-person communication and unrecorded phone calls with ELLISON. The conversations regarded ELLISON offering to provide a firearm to the CI while ELLISON had full knowledge that the CI was a convicted felon.

6.      On June 18, 2024, investigators attempted to conduct a controlled purchase of a firearm from ELLISON. While the CI was en route to ELLISON's residence in order to obtain the firearm from ELLISON, ELLISON contacted the CI and told the CI that there were "rules" that came with the firearm. ELLISON then redirected the CI to his (ELLISON's) brother's house at 11100 E. 49th Steet, Kansas City, Jackson County, Missouri, in the Western District of Missouri (**Target Location 2**). ELLISON's brother, Ernest HALL, sold the CI a Smith & Wesson, Model SD9VE, 9mm caliber pistol, bearing serial number FWT4113, (**Firearm #1**) in exchange for $300 in pre-recorded ATF funds. During the interaction, the CI inquired about the "rules" mentioned by ELLISON. HALL replied that the firearm "didn't come from us". While the CI was completing the purchase, HALL unveiled two more firearms. HALL identified one as a 9mm and the other as a .40 caliber. The CI informed HALL that the CI was a felon, and s/he couldn't buy guns. HALL told the CI that he (HALL) bought one of the firearms "hot." HALL then said, "I'm just gunna put more heat on it!" The CI told HALL "That's what I'm gunna do." HALL continued his (HALL's) advice by telling the CI that the CI can just buy guns off the street. HALL continued by saying "I'd rather have a hot pistol than a pistol in my name." The CI concluded the purchase for $300 and left the residence. Based on my training and experience in this investigation, I believe when HALL said the firearm "didn't come from us", HALL was referring to himself and ELLISON and making sure the CI did not tell anyone where the CI purchased the firearm. I also know "hot" is a slang word used to describe something stolen, and "heat" used in the context above is slang for intention to commit additional crimes using the firearm. When HALL stated he'd rather have a

4

Case 4:24-sw-00662-JAM     Document 1-1     Filed 11/26/24     Page 4 of 19

"hot pistol in my name than a pistol in my name," I believe HALL, who is also a convicted felon, is advising the CI, a convicted felon, it is better to have a stolen gun than to have a gun that can be traced back to them. **Firearm #1** is pictured below:



7. HALL was identified as a convicted felon with multiple arrests. HALL has been convicted in the state of Missouri, most notably, of multiple counts of First-Degree Robbery and Armed Criminal Action (1988, 1993, and 2006). HALL also has a felony conviction in the state of Missouri for First-Degree Endangering The Welfare Of A Child Creating Substantial Risk (2006).

## PURCHASE OF FIREARM #2

8. On June 25, 2024, HALL contacted the CI regarding the purchase of a firearm, and they made arrangements to purchase **Firearm #2** for $800 the next day.

9. On June 26, 2024, the CI responded to **Target Location 2.** After greeting a white female later identified as Barbara SAUNDERS, the CI entered the house and contacted HALL in a back bedroom. In the bedroom, HALL was wearing what appeared to be white socks on his hands. HALL appeared to be cleaning a firearm by wiping down the slide and trigger in a manner

5

Case 4:24-sw-00662-JAM    Document 1-1    Filed 11/26/24    Page 5 of 19

consistent with attempting to remove any DNA that may be on the firearm. The firearm was pulled out of a white, box-shaped container and the CI noted that it was the same gun and container he saw on June 18, 2024 (see paragraph 6). The CI told HALL "I'll take all these you can get, you know when I went down (arrested and charged) this is what I went down for?" HALL clarified that the CI was charged with selling "weapons" and the CI confirmed. The CI and HALL exchanged the money and HALL gave the CI a Canik, Model TP9SA, 9mm pistol, bearing serial number T647215AT33307 (**Firearm #2**.) **Firearm #2** is pictured below:



The two immediately began making jokes about not knowing one another while HALL placed the white container on the top shelf of a closet in the bedroom. After exiting the closet, HALL provided the CI with a blue box of 9mm ammunition which contained three (3) live rounds of 9mm ammunition. The CI then asked HALL "what kind of prices you talking about?" HALL replied "Shit, what kind of guns you talking about...I can get you a motherfuckin' AR pistol, dracos,

whatever." HALL and the CI continued to talk about acquiring guns that had "heat " on them and HALL, pretending to talk to a possible seller of a firearm, said "Imma put some more heat on it!" The CI and HALL exited the residence and after having a casual conversation, and making jokes about not knowing each other, the CI left in the CI's vehicle. As previously stated, "heat" used in the context above is slang for intention to commit additional crimes using the firearm. Based on my training and experience, I know a "Draco" is an AK-type firearm that shoots 7.62 x 39 caliber ammunition and can be a pistol or a rifle. I believe HALL is highlighting his ability to acquire high powered and high-capacity firearms. HALL is also reiterating if he obtains a firearm, he is going to use the firearm in a crime.

## PURCHASE OF FIREARM #3

10. On June 26, 2024, after completing the purchase of **Firearm #2**, the CI was contacted by ELLISON and informed that ELLISON had a firearm for sale. After concurrence with investigators, the CI arranged to purchase the firearm the next day.

11. On June 27, 2024, investigators responded to the address of ELLISON, located at 8004 East 103rd Terrace, Kansas City, Jackson County, Missouri, (**Target Location 1**), and initiated surveillance of the residence. Investigators identified a maroon Nissan with temporary tags, a black SUV bearing Missouri plate number XH7Z9G, an older full-size brown van, and an older El Camino-style vehicle parked at the residence. At approximately 1:49 p.m., the CI then placed a phone call to ELLISON at 816-996-3000. ELLISON told the CI that he (ELLISON) had to go get **Firearm #3** in the area of 54th and Woodland and that he (ELLISON) would call the CI back when ready. At approximately 2:10 p.m., the CI placed another phone call to ELLISON to check on the status and ELLISON told the CI to respond to 5524 Woodland Avenue, Kansas City, Jackson County, Missouri. ELLISON told the CI to park out front and wait for him at that location.

12. At approximately 2:27 p.m. ELLISON arrived in a burgundy vehicle that was later identified as a maroon Nissan, bearing Missouri temporary tag 07DMW. Investigators advised it was the same vehicle that had been parked at **Target Location 1** earlier in the day. A check of that license plate revealed it to be registered to Camesha Ellison at 8004 East 103rd Terrace, Kansas City, Missouri (Target Location 1).

13. After ELLISON walked up to the residence the CI joined ELLISON at the front door. When the door opened, ELLISON and the CI walked into the residence. Inside the residence was an individual whom ELLISON identified as his (ELLISON's) little brother. The individual was later identified as William WHITE. WHITE is a federally convicted felon, out of the District of Kansas, for intent to distribute crack cocaine in 1995. WHITE handed the CI the firearm and the CI was informed it was loaded. The CI handed ELLISON $400 for a Canik, model TP9SA, 9mm pistol, bearing serial number T6472-22AP00020 (**Firearm #3**), which was loaded with eight (8) live rounds. **Firearm #3** is pictured below:



The CI then left the residence at approximately 2:30 p.m.

8

14. At approximately 2:34 p.m., the CI contacted investigators and stated that ELLISON had just called the CI and offered to sell the CI a drum magazine for $200, however the CI told ELLISON that the CI did not have any more cash. ELLISON told the CI to wait for him (ELLISON) and he (ELLISON) would just give the magazine to the CI. Investigators followed ELLISON away from 5524 Woodland Avenue in the maroon Nissan to the area of 59th and Prospect and observed ELLISON park behind the CI's vehicle. The CI walked back to ELLISON's vehicle and obtained the item. The CI then returned to the CI's vehicle and drove to a predetermined location while being followed by investigators. Based on my training and experience, I know a "drum magazine" is a high capacity magazine that typically holds over 50 rounds of ammunition.

## PURCHASE OF FIREARM #4

15. On July 5, 2024, at approximately 10:00 a.m., ELLISON contacted the CI to see if the CI wanted to purchase a "9mm rifle." At approximately 5:30 p.m. the CI responded to ELLISON's residence and observed a black in color rifle and told ELLISON that s/he had a buyer interested. The CI left the residence and notified investigators about the firearm that ELLISON was trying to sell.

16. On July 7, 2024, at approximately 3:58 p.m., the CI arrived at **Target Location 1** and greeted him out front. ELLISON and the CI entered the driveway level doors that were next to the garage of the residence. While inside **Target Location 1**, ELLISON handed the CI **Firearm #4** and the CI provided ELLISON with $300 for the firearm. The CI told ELLISON that s/he would be willing to buy more firearms from ELLISON, and ELLISON responded, "I got some more, but I aint trying, I gotta keep some…know what I mean?" The CI agreed. Additionally, ELLISON said to the CI "Erny (aka Ernest HALL) said you were strapping up" the CI responded that he was "trying to." The firearm purchased was identified as a Hi-Point, Model 995, 9mm caliber rifle, bearing serial number B25304 (**Firearm #4**). Based on my training and experience, and

9

discussions with the CI, I believe when ELLISON stated he had "some more" and he wanted to "keep some" he was implying he was currently in possession (either actual or constructively) of additional firearms, but did not want to sell them to the CI. Based on my training and experience, I know criminals selling illicit items, like firearms and drugs, and who are at risk of being robbed, like to keep firearms for their protection. **Firearm #4** is pictured below:



Afterwards, the CI entered the CI's vehicle and left.

### PURCHASE OF FIREARM #5

17. On July 21, 2024, ELLISON contacted the CI to notify the CI about a firearm ELLISON was willing to sell.

18. On July 24, 2024, at approximately 4:21 p.m. the CI responded to **Target Location 1**. The CI contacted ELLISON at the driveway level doors that were next to the garage of the residence. While inside, ELLISON retrieved a firearm from a drawered piece of furniture inside the room. ELLISON double checked with the CI that the CI trusted the individual that s/he was selling the firearm to, and the CI tried to reassure ELLISON that s/he hasn't mentioned ELLISON's name to anyone. ELLISON then stated that the purchased firearm was from his (ELLISON's) neighbor. The CI purchased the firearm for $475 from ELLISON and ELLISON insisted on wiping the firearm down for fingerprints. The firearm purchased was identified as a Davis Industries, Model P, .380 caliber pistol, bearing serial number AP016124 (**Firearm #5**).

Based on my training and experience, I believe ELLISON wiped the firearm off and confirmed that the CI trusted the individual to whom he was selling the firearm because he is concerned the firearm will be recovered by law enforcement. If the firearm is recovered during a crime, ELLISON's fingerprints could be on the firearm or the CI, or someone the CI sells the firearm to, could tell law enforcement ELLISON sold them the firearm. **Firearm #5** is pictured below:



## ATTEMPTED PURCHASE OF A 6TH FIREARM

19. On or about July 28, 2024, ELLISON contacted the CI wanting to sell the CI a firearm for $425. However, due to logistics, investigators were unable to arrange an operation for the CI to purchase the firearm until August 1, 2024. On August 1, 2024, the CI, at the request of investigators, reached out to ELLISON in an attempt to arrange the purchase of the aforementioned firearm. ELLISON informed the CI on an unrecorded phone call, that he had already sold the gun to an unknown person. Based on my training and experience, I believe ELLISON was selling firearms to other individuals as well as the CI, instead of selling solely to the CI.

## PURCHASE OF FIREARMS #6 & #7

20. On November 18, 2024, ELLISON was in contact with the CI and informed the CI to bring as much money as possible because ELLISON had a lot of firearms to sell. The CI arranged for the deal to occur the following evening.

21. On November 19, 2024, at approximately 5:43 p.m. the CI responded to **Target Location 1** and awaited ELLISON's arrival. After ELLISON arrived, they entered **Target Location 1**, and ELLISON showed photos of firearms to the CI in order to show the CI what was available for sale. The CI asked how much each gun cost and ELLISON responded "12" ($1,200) for each firearm. The CI ordered two. Immediately ELLISON called HALL and told HALL to bring two firearms. The CI inquired why HALL was bringing guns when the CI thought he was buying from ELLISON. ELLISON responded, "I don't wanna sell my shit." ELLISON told the CI that he (ELLISON) had two firearms, but HALL had four at his house (**Target Location 2**). The CI asked to buy the two that ELLISON was in possession of, and ELLISON appeared to leave the room. A short time later, ELLISON showed the CI **Firearm #6**. The CI agreed to buy **Firearm #6** and buy one firearm from HALL instead of two. The CI gave ELLISON $1,200 for **Firearm #6**, a Mossberg International (CBC), Model 715P, .22 long rifle caliber pistol, bearing serial CP2204953. ELLISON instructed the CI to "wipe down (eliminate fingerprint and DNA evidence)" the firearm. This is the second time ELLISON admitted to selling firearms and not wanting to sell them, the first time is noted in paragraph 16. This is also the second time ELLISON has expressed concerns about his fingerprints being on the firearms. **Firearm #6** is pictured below:



Additionally, the firearm was loaded with 19 live .22 long rifle rounds. A computer check of **Firearm #6** was completed and revealed it to be stolen.

22. After the purchase, the CI asked how many other firearms ELLISON had to sell. ELLISON asked how many the CI wanted and the CI informed ELLISON that s/he may come back for a "couple more". The CI asked what four firearms would cost and ELLISON told the CI four firearms would cost $1,050 each. As casual conversation continued, ELLISON told the CI that he (ELLISON) was in possession of a .40 caliber pistol "with a 100 round clip." The CI asked how much ELLISON would sell the firearm for and ELLISON informed the CI that it wasn't for sale because he had to "save something." ELLISON informed the CI that he (ELLISON) was in possession of "four of those mother fuckers (firearms)." The CI asked ELLISON why he (ELLISON) would want to keep four guns. ELLISON didn't answer the CI but instead said that HALL had "bought everything off the train." ELLISON told the CI that a flat-bed truck full of guns was brought to **Target Location 1** and "a whole generation got one of them bitches!" As

previously stated, I believe ELLISON wants to keep firearms for his protection, and when ELLISON said he had to "save something," he is stating he wants to save firearms for himself. Based on my training and experience in this investigation, I believe when ELLISON stated HALL "bought everything off the train" and a flat-bed truck full of guns was brought to **Target Location 1**, ELLISON is boasting about the number of firearms he and HALL can obtain for the CI.

23. Additionally, ELLISON mentioned two different times using and wanting to use money from selling guns for supplementing his (ELLISON's) income and lifestyle. ELLISON then told the CI that he (ELLISON) had to sell some guns to pay for repairs on his (ELLISON's) "Trans-Am," and he (ELLISON) told the CI he (ELLISON) would be willing to trade "one of those mother fucking things (firearms)" for a common associate's truck he (ELLISON) wanted to purchase.

24. ELLISON asked the CI what s/he was doing with all the guns s/he has bought. The CI responded "Sell, trade" and ELLISON told the CI to be careful. While they were talking, HALL arrived carrying in an AR-style pistol and told the CI it was brand new. After negotiating over price, the CI purchased the firearm for $1,300. HALL's girlfriend, SAUNDERS, arrived with him (HALL) and after the deal for $1,300 was made, it was SAUNDERS who gathered the money. The firearm purchased from HALL was a Palmetto State, Model PA-15, 5.56/2.23 caliber pistol, bearing serial number SCB742294 (**Firearm #7**). **Firearm #7** is pictured below:



The firearm was loaded with 29 live 2.23/5.56 rounds.

25. On November 20, 2024, ELLISON spontaneously contacted the CI to let the CI know s/he could order as many firearms as s/he needed. The CI only needed to provide a day s/he wanted to purchase them, and ELLISON would have the firearms at his residence.

### PURCHASE OF FIREARMS #8 & #9

26. On November 23, 2024, HALL was in contact with the CI and informed the CI he had two machine guns for sale for $5,000. HALL stated he had even more guns if the CI wanted them. Utilizing video communications, HALL showed the CI the firearms he had for sale.

27. On November 25, 2024, at approximately 2:00 p.m., the CI responded to **Target Location 2** and met with HALL inside the residence. HALL brought two firearms for the CI to purchase (**Firearms #8 & #9**). HALL stated **Firearm #8** was a machine gun, but **Firearm #9** was not. HALL explained that the wire like device attached to the firearm was what made the firearm a machine gun. HALL said the device had to be behind the trigger when you pulled the trigger.

15

The CI inquired why HALL did not have the other machine gun and HALL said he had it, but would not sell it to the CI. Since HALL originally agreed to sell two machine guns, the CI argued with HALL and insisted HALL sell the second machine gun. HALL would not agree to sell it and eventually the CI left with **Firearms #8 & #9**. HALL stated he would have more firearms in the future. Based on my training and experience, and as previously stated, I believe HALL wanted to keep the firearm for his personal use to protect himself.

28. During a debrief of the CI after the transaction, the CI stated he saw other rifles at **Target Location 2** and HALL stated he had handguns at **Target Location 2**.

29. **Firearm #8** does not have any markings on it and has a device attached to it that is behind the trigger intended to turn the firearm into a machine gun. **Firearm #8** will be sent to the ATF laboratory for further analysis. **Firearm #9** is an Anderson Manufacturing, Model AM-15, bearing serial number 24115968.

## PURCHASE OF FIREARMS #10 & #11

30. On November 23, 2024, ELLISON was in contact with the CI and informed the CI he had two guns for sale for $2,500.

31. On November 25, 2024, at approximately 3:00 p.m., the CI responded to **Target Location 1** and met with ELLISON inside the residence. HALL was also located at **Target Location 1**. After the CI arrived, another individual with a backpack arrived at the residence and provided ELLISON with **Firearm #10**. ELLISON gave **Firearm #10** and **Firearm #11** to the CI. The CI paid ELLISON for both firearms. ELLISON stated he had four more .40 caliber firearms and showed the CI a .40 caliber pistol he had retrieved from a different room inside **Target Location 1**.

32. During a debrief of the CI after the transaction, the CI stated s/he observed a .300 blackout pistol without a scope under a towel on the pool table. The CI stated when the CI left **Target Location 1** it had been moved behind the bar.

33. **Firearm #10** is a Anderson Manufacturing, Model AM-15, bearing serial number 24044432. **Firearm #11** is also an Anderson Manufacturing, Model AM-15, bearing serial number 24141464.

34. After the CI left the residence, investigators continued to review stationary surveillance and observed ELLISON enter **Target Location 1** with a rifle. A picture from the surveillance is below:



35. ELLISON was convicted of the following felonies in the 16th Judicial Circuit Court of Jackson County, Missouri:

- 1st Degree Tampering – Case No. 16CR88004146. He was found guilty on October 7, 1988.

17

- 2nd Degree Murder and Armed Criminal Action – Case No. 49100097601. He was found guilty on June 25, 1992.

36. HALL was convicted of the following felonies in the 16th Judicial Circuit Court of Jackson County, Missouri:

- 1st Degree Tampering. He was found guilty on March 24, 1986.

- One (1) count of 1st Degree Tampering, one (1) count of Felony Stealing, three (3) counts of 1st Degree Armed Robbery and three (3) counts of Armed Criminal Action – Case No. CR853313. He was found guilty.

- Three (3) counts of 1st Degree Robbery and three (3) counts of Armed Criminal Action – Case No. 49200230600. He was found guilty on April 1, 1993.

- 2nd Degree Robbery and Armed Criminal Action – Case No. 0616CR0014201. He was found guilty on September 7, 2006.

37. HALL was convicted of the following felony in the 26th Judicial Circuit Court of Morgan County, Missouri:

- 1st Degree Endangering the Welfare of a Child: 1st Offense, No Sexual Contact – Case No. 16MGCR0006201. He was found guilty on August 11, 2016.

**INTERSTATE COMMERCE**

38. On November 25, 2024, Interstate Nexus ATF Special Agent Steven White reviewed the recovered firearms and determined that **Firearms #1-#7** and **#9-#11** were not manufactured in the state of Missouri, therefore affecting interstate commerce. Special Agent White was unable to determine if **Firearm #8** traveled interstate due to the lack of markings required by manufacturers. Based on my training and experience, I believe **Firearm #8** to be a Privately Manufactured Firearm (PMF). Additionally, my training and experience leads me to

believe that PMFs are a desired item amongst criminal groups due to the difficulty in tracking their origin.

## CONCLUSION

39.     Based on the foregoing, the affiant believes there is probable cause to believe that Rodney ELLISON and Ernest HALL committed violations of Title 18, United States Code, Sections 922(g)(1), (felon in possession of a firearm) and 933(a)(1), (trafficking in firearms). Additionally, the affiant believes there is probable cause to believe that evidence of the previously mentioned violations may be found at **Target Locations 1 and 2.**

DEREK GARTH
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed to and sworn to before me
on this ___26th___ day of November, 2024,

HONORABLE JOHN T. MAUGHMER
United States Magistrate Judge
Western District of Missouri